IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| CHESAPEAKE HARBOUR MARINA, INC., <br> *Plaintiff*, <br><br> v. <br><br> M/V "SOUTHERN CHARM," *et al.*, <br> *Defendants*. | Civil Action No. ELH-20-2770 |

# MEMORANDUM OPINION

This Memorandum resolves a motion for default judgment, arising from an admiralty action.

On September 23, 2020, plaintiff Chesapeake Harbour Marina, Inc. ("Chesapeake" or the "Marina") filed suit against defendants M/V "Southern Charm" (alternatively, the "Vessel" or the "Yacht") and Pelican Investment, LLC ("Pelican"), the alleged owner of the Yacht. ECF 1 (the "Verified Complaint"). The suit includes a "Verification," a sworn statement submitted by Marie Carbone, the Chief Financial Officer ("CFO") of Chesapeake. *Id.* at 11. And, the Verified Complaint is supported by two exhibits. ECF 1-1; ECF 1-2.

Chesapeake asserts admiralty jurisdiction, pursuant to 28 U.S.C. § 1333. ECF 1, ¶ 1. In Count I, plaintiff brings a claim *in rem* against the Vessel, seeking to foreclose on an alleged maritime lien under the Commercial Instruments and Maritime Liens Act ("CIMLA"), 46 U.S.C. § 31301, *et seq. Id.* at 5. Plaintiff also lodges three claims against Pelican: breach of maritime contract (Count II); quantum meruit (Count III); and unjust enrichment (Count IV). *Id.* at 6-8.

In addition, Chesapeake moved for appointment of a substitute custodian for the Southern Charm (ECF 2), and for issuance of a warrant in rem, ordering the United States Marshal to take and retain custody of the Southern Charm. ECF 3. The Court promptly granted those motions.

ECF 5; ECF 6.  The warrant was executed on September 24, 2020 (ECF 7), and the Vessel was arrested the next day.  ECF 9; ECF 10 at 2.

Pelican has not responded to the Verified Complaint.  On October 27, 2020, Chesapeake filed a request for entry of default *in rem* against the Vessel, pursuant to Fed. R. Civ. P. 55(a) and Local Admiralty Rule (c)(4).  ECF 10.  Plaintiff did not seek an entry of default as to three Counts lodged against Pelican.  *See id.* at 1-5.  Thereafter, the Clerk entered default against the Vessel.  ECF 11.

Chesapeake then sought default judgment against the Vessel (ECF 13) and filed a "Motion for Interlocutory Judicial Sale of Vessel."  ECF 14.  Plaintiff has since filed an amended motion for default judgment (ECF 17, the "Motion") and an "Amended Motion For Interlocutory Judicial Sale of Vessel."  ECF 16 (the "Sale Motion").  Both are supported by exhibits.  The initial motions each reserved the right to apprise the Court of increased *custodia legis* costs with regard to the Vessel.  ECF 13, ¶ 10; ECF 14, ¶ 10.  And, amended motions were filed to reflect those increased custodial costs.  ECF 16 at 1; ECF 17 at 1.  Plaintiff has also filed a "Status Report And Update Of Custodia Legis Fees."  ECF 18.

No hearing is needed to resolve the motions.  *See* Local Rule 105.6.  I shall deny ECF 13 and ECF 14 as moot, because they have been superseded.  And, for the reasons that follow, I shall grant in part and deny in part the Motion, and I shall grant in part and deny in part the Sale Motion.

## I.  Background[1]

Chesapeake is a "yacht service business" headquartered in Annapolis.  ECF 1 at 1; *see id.* at 3.  In October 2019, Chesapeake and Pelican entered into an agreement by which Chesapeake

---

[1] Under the circumstances, I must assume the truth of the facts alleged in the suit, other than those pertaining to damages, as discussed *infra*.  *See Ryan v. Homecomings Fin. Network.*

would "provide one year of dockage" to the Southern Charm, which was owned by Pelican, at a cost of $21,120 to Pelican. *Id*. ¶ 7; *see* ECF 1-1 ("Annual Dockage License Agreement," *i.e.*, the "Agreement"). The Agreement was executed by Chesapeake and George Scarborough, as "Manager" of Pelican. ECF 1, ¶ 8; ECF 1-1 at 1-2. Scarborough was a "person presumed to have authority to procure necessaries for the Yacht pursuant to 46 U.S.C. § 31341." ECF 1, ¶ 22. The contract period was to run from October 1, 2019 to September 30, 2020. ECF 1-1 at 1. Plaintiff alleges that Pelican has not paid any of the money owed on the Agreement. ECF 1, ¶ 9, 10, 16.

In "early December of 2019," Scarborough "indicated to the Marina that he needed to take his boat out of the Marina to fuel it up, and would return shortly." *Id*. ¶ 12. However, Scarborough did not return with the Southern Charm. *Id*. ¶ 15. Before leaving, Scarborough "tendered a check for $10,400, approximately one-half of the annual dockage owed . . . ." *Id*. ¶ 13. Chesapeake attempted to deposit the check but it "bounced" due to insufficient funds. *Id*. ¶ 14.

Thereafter, Chesapeake "demanded payment multiple times," and Pelican "promised to pay many times . . . ." *Id*. ¶ 17. An exhibit appended to the Verified Complaint contains correspondence between Scarborough and Carbone dated February 5, 2020, in which Scarborough stated that he intended to "wire most of the $10,400" within a matter of days. ECF 1-2. But, no payments were made. ECF 1, ¶¶ 16, 17.

The Verified Complaint also draws attention to ¶ 3 and ¶ 9 of the Agreement. ECF 1, ¶¶ 18, 19. Paragraph 3 of the Agreement states, ECF 1-1:

> **3. Dockage Fee:** Dockage fee is as stated above, provided, however, if Owner fails to pay the remainder of the dockage fee by the Due Date, the Owner shall be in default (refer to paragraph 18). At such time as a default occurs, Chesapeake may choose to withdraw the annual rate and impose the daily rate from the first day of the Agreement period.

253 F.3d 778, 780 (4th Cir. 2001); *Agora Fin., LLC v. Samler*, 725 F. Supp. 2d 491, 494 (D. Md. 2010).

Paragraph 9 of the Agreement states, in pertinent part, *id.*:

**9. Maritime Lien:**  Chesapeake shall have a maritime lien under federal and state law for all charges, costs and expenses in providing dockage, supplies, necessities, work, material or other assistance to or for the benefit of the Vessel. . . .  All costs and charges of securing, hauling, moving, blocking, guarding, insuring, and all other expenses relating to the enforcement of Chesapeake's legal rights, including reasonable attorney's fees, shall constitute a charge and lien against the Vessel.

According to the Verified Complaint, the "daily rate in effect in October 2019 for the Marina was $3 per foot per day; as such the daily rate for the Yacht, which is approximately 72 feet long and occupies a 88-foot long T-head slip, would have been $264 per day." ECF 1, ¶ 20.

Paragraph 18 of the Agreement is also relevant.  It provides that if the Vessel's owner "breaches any term of this Agreement (including payments)," then the owner "shall be deemed to be in default . . . of this Agreement." ECF 1-1 at 2.

Additional facts are included, *infra*.

## II.  Default Judgment Generally

Rule 55(b) of the Federal Rules of Civil procedure governs default judgments.  In particular, Rule 55(b)(1) provides that the clerk must enter a default judgment if the plaintiff's claim is "for a sum certain or a sum that can be made certain by computation."[2]  But, "[a] plaintiff's assertion of a sum in a Verified Complaint does not make the sum 'certain' unless the plaintiff claims liquidated damages; otherwise the Verified Complaint must be supported by affidavit or

---

[2] If the sum is not certain or ascertainable through computation, the court looks to Rule 55(b)(2).

documentary evidence." *Monge v. Portofino Ristorante*, 751 F. Supp. 2d 789, 794 (D. Md. 2010) (Grimm, M.J.).[3]

To be sure, the United States Court of Appeals for the Fourth Circuit has a "strong policy favoring the disposition of cases on the merits . . . ." *Rangarajan v. Johns Hopkins Univ.*, 917 F.3d 218, 229 (4th Cir. 2019) (discussing *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 462 (4th Cir. 1993)), *cert. denied*, 139 S. Ct. 2762 (2019); *see Projects Mgmt. Co. v. Dyncorp Int'l LLC*, 734 F.3d 366, 376 (4th Cir. 2013). But, that policy is not absolute. Default judgment "'is appropriate when the adversary process has been halted because of an essentially unresponsive party.'" *Garnier-Thiebaut, Inc. v. Castello 1935 Inc.*, SDT-17-3632, 2019 WL 6696694, at *1 (D. Md. Dec. 6, 2019) (Thacker, J.) (quoting *Int'l Painters & Allied Trades Indus. Pension Fund v. Cap. Restoration & Painting Co.*, 919 F. Supp. 2d 680, 684 (D. Md. 2013)); *see SEC v. Lawbaugh*, 359 F. Supp. 2d 418, 421 (D. Md. 2005).

When, as here, the defendant does not respond to the suit, the plaintiff's factual allegations are deemed admitted, save for those pertaining to damages. *See* Fed. R. Civ. P. 8(b)(6); *Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001) (stating that the court must "determine whether the well-pleaded allegations . . . support the relief sought"). But, "'a default is not treated as an absolute confession by the defendant of his liability and of the plaintiff's right to recover.'" *Ryan*, 253 F.3d at 780 (citation omitted). The court must assess whether the undisputed factual allegations constitute a legitimate cause of action. *Id.*; *see* 10A Wright & Miller, Federal Practice and Procedure § 2688 (4th ed., 2020 Supp.) ("[L]iability is not deemed

---

[3] Judge Grimm now serves as a United States District Judge. He authored *Monge* when he was a United States Magistrate Judge.

established simply because of the default . . . . the court, in its discretion, may require some proof of the facts that must be established in order to determine liability.").

If the court is satisfied that liability has been established, it must then determine the appropriate amount of damages. *Ryan*, 253 F.3d at 780-81. Allegations "relating to the amount of damages" are not deemed admitted based on a defendant's failure to respond to a suit. Fed R. Civ. P. 8(b)(6); *see Monge*, 751 Supp. 2d at 794; *Agora Fin., LLC v. Samler*, 725 F. Supp. 2d 491, 494 (D. Md. 2010). Rather, the court "must make an independent determination regarding such allegations." *Agora Fin., LLC*, 725 F. Supp. 2d at 494; *see Credit Lyonnais Secs. (USA), Inc. v. Alcantara,* 183 F.3d 151, 154 (2d Cir.1999).

In so doing, the court may conduct an evidentiary hearing, Fed. R. Civ. P. 55(b)(2). But, a hearing is not required, so long as there is an adequate evidentiary basis in the record to support an award of the requested damages. *Educ. Credit Mgmt. Corp. v. Optimum Welding*, 285 F.R.D. 371, 374 (D. Md. 2012) ("While the court may hold a hearing to consider evidence as to damages, it is not required to do so; it may rely instead on 'detailed affidavits or documentary evidence to determine the appropriate sum.'") (quoting *Adkins v. Teseo*, 180 F. Supp. 2d 15, 17 (D.D.C. 2001)); *see Monge*, 751 F. Supp. 2d at 795.

Notably, under Fed. R. Civ. P. 54(c), "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." *See In re Genesys Data Techs, Inc.*, 204 F.3d 124, 132 (4th Cir. 2000) ("When a Verified Complaint demands a specific amount of damages, courts have generally held that a default judgment cannot award additional damages."). This is because the amount sought as damages might influence the defendant in deciding whether to expend the resources to defend the action. *Monge*, 751 F. Supp. 2d at 796.

### III. Discussion

### A. Liability

#### 1. Legitimate Cause of Action

First, I assess whether Chesapeake asserts a legitimate cause of action.

In the Motion, Chesapeake seeks to "foreclose a maritime lien arising from necessaries provided to the M/V "Southern Charm" . . . ." ECF 17, ¶ 1. Plaintiff's *in rem* claim invokes the CIMLA, 46 U.S.C. § 31301, *et seq*. ECF 1 at 5.[4]

In particular, plaintiff alleges that the "dockage provided by the Marina on the Yacht constituted 'necessaries' within the meaning of 46 U.S.C. § 31301(4)." *Id.* ¶ 23. Further, in Count I plaintiff alleges that it "is owed the total sum of at least $21,120.00 for necessaries provided to the Defendant Yacht, in the form of dockage services provided under the Agreement." *Id.* ¶ 27.

Although neither the Verified Complaint nor the Motion mention 46 U.S.C. § 31342, the *in rem* claim appears to be founded on that statute. Section 31342(a) states, in pertinent part:

> [A] person providing necessaries to a vessel on the order of the owner or a person authorized by the owner—
>
> (1) has a maritime lien on the vessel;
>
> (2) may bring a civil action in rem to enforce the lien; and
>
> (3) is not required to allege or prove in the action that credit was given to the vessel.

---

[4] The statute pertaining to foreclosure on maritime liens appears to be referenced by different names in the case law. Like plaintiff, some judicial decisions refer to the act as the CIMLA. *See, e.g.*, *Addax Energy SA v. M/V Yasa H. Mulla*, 987 F.3d 80, 85 (4th Cir. 2021). In others, the act is called the Federal Maritime Lien Act. *See, e.g.*, *World Fuel Servs. Trading, DMCC v. Hebei Prince Shipping Co.*, 783 F.3d 507, 509 (4th Cir. 2015). Other courts have observed the variation. Judge Smalkin explained: "Before a recodification of Title 46 in 1989, th[e] portion of CIMLA governing maritime liens was known as the Federal Maritime Liens Act ("FMLA")." *Ceres Marine Terminals, Inc. v. M/V Harmen Oldendorff*, 913 F. Supp. 919, 922 n.2 (D. Md. 1995) (brackets added).

Thus, to foreclose on a maritime lien under § 31342(a), a "plaintiff must demonstrate that he has (1) provided 'necessaries' to a vessel (2) on the order of the vessel's owner or a person authorized by the owner." *Sears v. Sailing Vessel "Smithereens"*, No. ELH-13-3389, 2014 WL 2707633, at *3 (D. Md. June 13, 2014) (report and recommendation by Gesner, M.J.).[5]

Recently, in *Addax Energy SA v. M/V Yasa H. Mulla*, 987 F.3d 80, 86 (4th Cir. 2021), the Fourth Circuit addressed the foundation of maritime lien actions. The Court explained:

> A maritime lien "is a right in the vessel" that entitles a vessel's creditor to have the vessel sold in order to satisfy an outstanding debt. *Itel Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd.*, 982 F.2d 765, 768 (2d Cir. 1992) (citation omitted). When a creditor holds such a lien, "the vessel itself is viewed as the obligor, regardless of whether the vessel's owner is also obligated." *Triton Marine Fuels Ltd. v. M/V Pac. Chukotka*, 575 F.3d 409, 414 (4th Cir. 2009).

In addition, the Court noted that a claimant seeking to enforce a maritime lien may also "seek damages against the party responsible for breach of contract." *Id.* But, "a provider of necessaries . . . may not 'double-recover' on its debt." *Id.* (citation omitted).

Section 31304(4) of 46 U.S.C. defines "necessaries" to include "repairs, supplies, towage, and the use of a dry dock or marine railway." Courts have liberally construed the statutory definition of "necessaries" to encompass "'what is reasonably needed in the ship's business.'" *Bradford Marine, Inc. v. M/V Sea Falcon*, 64 F.3d 585, 589 (11th Cir. 1995) (citation omitted); *see Triton Marine Fuels, Ltd. v. M/V PACIFIC CHUKOTKA*, 671 F. Supp. 2d 753, 759 (D. Md. 2009). Accordingly, courts have determined that "dockage and wharfage costs," as well as "maintenance, insurance, and prejudgment interest," qualify as necessaries. *Sears*, 2014 WL 2707633, at *3 (citing *Ceres Marine Terminals, Inc. v. M/V Harmen Oldendorf,* 913 F. Supp. 919, 927 (D. Md. 1995)).

---

[5] In *Sears*, by Order of July 2, 2014, I adopted Judge Gesner's report and recommendation, 2014 WL 2707633. *See* Case 1:13-cv-3389-ELH, ECF 22.

Chesapeake's submissions demonstrate that it has provided necessaries to the Vessel on the order of its owner.  According to the Verified Complaint and the Agreement, plaintiff provided dockage to the Vessel beginning on October 1, 2019.  ECF 1, ¶¶ 1, 20-23; ECF 1-1.  As discussed, dockage costs constitute necessaries under the CIMLA.  And, the "dockage . . . was requested by George Scarborough, as Manager for Pelican . . . which is the owner of the [Vessel] and/or a person authorized by the owner of the [Vessel], and/or a person presumed to have authority to procure necessaries for the Yacht pursuant to 46 U.S.C. § 31341."  ECF 1, ¶ 22.  Moreover, Scarborough executed the Agreement, on behalf of Pelican, and corresponded with Carbone, the Chesapeake CFO, about payment.  ECF 1-1; ECF 1-2.

Accordingly, Chesapeake has stated a cause of action for a maritime lien, pursuant to 46 U.S.C. § 31342.

## 2.  Notice

Local Admiralty Rule (c)(3)(a)(i) sets forth notice requirements applicable to motions for default judgment in *in rem* actions.  The rule states:

> Notice Given.  A party seeking a default judgment in an action in rem must satisfy the judge that due notice of the action and arrest of the property has been given (1) by publication as required in LAR(c)(2); (2) by service of the complaint and warrant of arrest upon the Marshal and keeper, substitute custodian, master, or other person having custody of the property; and (3) by mailing such notice to every other person who has not appeared in the action and is known to the party seeking the default judgment to have an ownership interest in the property.

After the arrest of the Vessel by the U.S. Marshal, Chesapeake "mailed notice of this action via certified mail . . . to all persons identified as having an interest in the vessel on the United States Coast Guard Abstract of Title for the Vessel," pursuant to the Local Admiralty Rules.  ECF

10, ¶ 3(a); *see* ECF 10-1.[6]  The Abstract of Title reflected that the only entity with an interest in the Vessel was Pelican.  ECF 10, ¶ 3(a).

Plaintiff mailed notice of the arrest to Pelican, at its two registered addresses.  *Id.* ¶ 3(b).[7] Fourteen days after the arrest, plaintiff "published notice of the arrest in a newspaper of general circulation . . . ."  *Id.* ¶ 3(c); *see* ECF 10-5.  Moreover, plaintiff's counsel provided Scarborough with actual notice of the arrest via a phone call on September 25, 2020, and also via email.  ECF 10,   ¶ 3(e); *see* ECF 10-6 (Affidavit of Counsel).  Counsel also emailed the pleadings filed as of that date to Scarborough.  *Id.*

Therefore, Chesapeake has satisfied the notice requirements of Local Admiralty Rule (c).

### B.  Damages & *Custodia Legis* Expenses

Chesapeake seeks to recover the annual dockage fee set forth in the Agreement, the custodial costs of maintaining the Vessel, and $900 in legal costs.  Notably, Chesapeake's submissions do not contain any citations to legal authority that address the assessment of damages and custodial costs in a CIMLA foreclosure action.

#### 1.

Plaintiff seeks "the balance on the amount owed for dockage of the Vessel, at the stipulated contract rate of $21,120."  ECF 17, ¶ 5.  The Court must determine whether the balance owed by Pelican, set by the Agreement, reflects the cost to plaintiff of "necessaries" within the meaning of 46 U.S.C. § 31304(4), such that plaintiff can recover that balance in a maritime lien foreclosure action under 46 U.S.C. § 31342(a).

---

[6] The dates are not apparent on ECF 10-1.

[7] Again, the dates are not apparent.

To be sure, Chesapeake might pursue its *in personam* claims against defendant for breach of maritime contract, quantum meruit, and unjust enrichment. *See Addax Energy SA*, 987 F.3d at 86. But, default was entered *in rem* as to the Vessel, not as to plaintiff's *in personam* claims. ECF 11. As Judge J. Frederick Motz has observed, the view of the majority of courts is "that the terms in the underlying contract for necessaries are not automatically covered by the resulting lien." *Triton Marine Fules, Ltd.*, 671 F. Supp. 2d at 760-61.

As mentioned, dockage costs constitute necessaries. *Ceres Marine Terminals*, 913 F. Supp. at 927. However, according to the Verified Complaint, plaintiff provided dockage to the Vessel for just a fraction of the contract period, which was to run from October 1, 2019 to September 30, 2020. ECF 1-2 at 1. Plaintiff asserts that in "early December of 2019," Scarborough left the Marina in the Vessel and did not return. ECF 1, ¶ 12. The Vessel was returned to the Marina only after its arrest by the U.S. Marshal, on September 25, 2020. *See* ECF 9. Thus, plaintiff has not indicated the precise duration of time for which it provided necessaries.

However, the submissions permit the reasonable inference that the Vessel was docked at the Marina no earlier than October 1, 2019, and no later than "early December." Assuming that the Vessel was not docked at the Marina past December 15, 2019, the approximate midpoint of the month, then the Vessel was docked at the Marina for a total of 76 days in 2019. Clearly, Chesapeake is entitled to recover necessaries as to this time period. Dockage costs may be calculated at the daily rate on which plaintiff relies in itemizing its *custodia legis* expenses, which is $264/day, as discussed *infra*. Therefore, Chesapeake is entitled to $20,064 in damages for dockage of the Southern Vessel.

**2.**

As noted, by Order of September 23, 2020, the Court appointed plaintiff as the Substitute Custodian of the Vessel. ECF 5. That Order authorized plaintiff to recover *custodia legis* expenses "at the dockage rate of $3 per foot per day, to be stored at an 88-foot T-head slip, plus a reasonable market rate for any services it deems reasonable and necessary to preserve the Vessel pending this litigation, plus a reasonable market rate for any recovery costs to transport the Vessel to [the Marina]." ECF 2 (motion to appoint substitute custodian); *see* ECF 5 (granting ECF 2).

As explained in *Sears*, 2014 WL 2707633, at *5:

> A substitute custodian is entitled to recover expenses incurred for preservation of the vessel. *New York Dock Company v. Steamship Poznan,* 274 U.S. 117, 120–121 (1927). The right of a substitute custodian to recover these expenses is distinct from a maritime lien; a lien for *custodia legis* expenses depends "not upon the existence of a maritime lien, but upon principles of general application which should govern whenever a court undertakes the administration of property or a fund brought into its custody for the benefit of suitors." *Id.,* at 120. A lien for *custodia legis* expenses has priority over other claims against the vessel. *Id.,* at 121.

*See also See Robbie's of Key W. v. M/V Komedy III*, 470 F. Supp. 3d 1264, 1269 (S.D. Fla. 2020) ("It is well settled that the expenses incurred in operating and caring for a vessel while in the custody of the court are considered 'expense of justice' subject to reimbursement.") (quoting *Donald D. Forsht Assocs., Inc. v. Transamerica ICS, Inc.*, 821 F.2d 1556, 1561–62 (11th Cir. 1987)).

Plaintiff's original motion for default judgment, the pending Motion, and the status report of March 3, 2021, each include a "Rule 55(b) Affidavit Of Marie Carbone." ECF 17-1; ECF 17-2; ECF 18-1. These affidavits reflect that plaintiff calculates the daily cost dockage cost from the day after the arrest of the Vessel, September 26, 2020, at a rate of $3 per foot, multiplied by 88 feet, for a total of $264 per day. *See* ECF 17-1; ECF 17-2; ECF 18-1. To date, April 7, 2021, plaintiff has provided dockage to the Vessel for 194 days, for a total of $51,216.

In addition, Chesapeake incurred expenses of $2,500 in towing and securing the Vessel after the arrest, ECF 17-1; $760 in "Support Boat/Staff on day of arrest," *id.*; $2,625 in "Mechanic/Marina Staff's Services to Maintain the Vessel While Under Arrest," incurred through November 10, 2020, ECF 17-1 at 1; $3,300 in "Mechanic/Marina Staff's Services," incurred between November 10, 2020, and January 14, 2021, ECF 17-2 at 1; $2,150 in "Mechanic/Marina Staff's Services," ECF 18-1 at 1; and, $5,084.53 in "Winterization Costs." ECF 17-2 at 2. These expenses total $16,419.53.

Chesapeake also seeks to recover $400 in court filing fees and $500 in "Marshal's fees to arrest the Vessel." ECF 17, ¶ 6. Courts have permitted the recovery of such costs in claims for *custodia legis* expenses. *See, e.g.*, *Villa Del Mar Properties, LTD., L.P. v. Michelle*, 2:19-CV-08690-ODW-(MRWx), 2021 WL 76710, at *4 (C.D. Cal. Jan. 8, 2021); *Bay Marine Salvage And Servs., Ltd. v. Motor Vessel 44' EGG HARBOR, MC 7336 KA*, 08-11407, 2009 WL 3614986, at *2 (E.D. Mich. Oct. 27, 2009); *Georgetown Yacht Basin, Inc. v. M/V Fourth Pawn*, 455 F. Supp. 2d 370, 375 (E.D. Pa. 2006). Accordingly, I conclude that plaintiff is recover $900 in legal costs.

Therefore, plaintiff is entitled to a lien for the sum of $51,216 and $16,419, which plaintiff clearly incurred pursuant to the Court's Order to provide routine services for the safekeeping of the Vessel. In total, plaintiff has incurred $67,635.53 in *custodia legis* expenses, plus $900 in legal costs. A priority lien in favor of plaintiff and against the Vessel in the total amount of $68,535.53 is appropriate.

### C. Judicial Sale of Vessel

Chesapeake also asks the Court to order the sale of the Vessel. ECF 16.

A maritime lien "'grants the creditor the right to appropriate the vessel, have it sold, and be repaid the debt from the proceeds.'" *Marine Oil Trading Ltd. v. Motor Tanker PAROS*, 287 F.

Supp. 2d 638, 640 (E.D. Va. 2003) (quoting *Silver Star Ents. v. SARAMACCA MV*, 82 F.3d 666, 668 (5th Cir. 1996)). "At the sale, a lienholder may bid at the judicial sale on credit up to the amount of its *in rem* judgment without being required to pay that amount in cash." *Sears*, 2014 WL 2707633, at *6; *see Branch Banking & Trust Co. v. Fishing Vessel Topless,* 2013 WL 3732734 (D.Md.2013). A judicial sale is subject to the procedural requirements of Local Admiralty Rule (e)(12).

I shall order a judicial sale of the Vessel. Plaintiff shall be permitted to bid on the Vessel at the Marshal sale with credit of $88,599.53, that being the sum of plaintiff's judgment against the Vessel *in rem* ($20,064) and plaintiff's *custodia legis* fees and costs ($68,535.53) incurred through April 7, 2021, for storing and maintaining the Vessel following arrest.[8]

### IV.  Conclusion

For the reasons set forth above, I shall grant in part and deny in part the Motion (ECF 17), insofar as the Court's assessment of damages and *custodia legis* expenses differs from that set forth in the Motion. And, I shall grant in part and deny in part the Sale Motion (ECF 16). I shall order a judicial sale of the Vessel. The amount of credit to which plaintiff will be entitled at the auction shall reflect the Court's total assessment of damages, *custodia legis* expenses, and costs.

An Order and a Decree of Sale follow, consistent with this Memorandum Opinion.

Date:  April 7, 2021                                         /s/
                                                             Ellen Lipton Hollander
                                                             United States District Judge

---

[8] Plaintiff states, ECF 17 at 5:

> Plaintiff reserves the right to file a motion to increase the amount of the Court's *in rem* judgment to account for recovery of *custodia legis* fees incurred following entry of default judgment. Should the Court order a judicial sale of the Vessel to satisfy the judgment, Plaintiff intends to file a supplementary motion to credit bid the additional amount of attorneys' fees and *custodia legis* fees incurred between entry of judgment and sale of the Vessel.